**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH MADONIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 09-CV-7779 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| BP PRODUCTS NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Joseph Madonia filed a two-count complaint alleging that Defendant BP Products North America, Inc. ("BP") violated Title VII by discriminating against him on the basis of his race (Caucasian) and retaliating against him for engaging in protected activity. Defendant has moved for summary judgment on both claims. For the reasons set forth below, the Court grants Defendant's motion for summary judgment [29].

## I. Background

### A. Plaintiff's Response to Defendant's Statement of Facts

It is the function of the Court to review carefully statements of material facts and to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). "Pleadings that do not conform with the local rules may be stricken at the discretion of the court." *Id*. at 640 (citing *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir. 1990)); *Pfeil v. Rogers*, 757 F.2d 850, 858 (7th Cir. 1985);

*Graham v. Security Sav. & Loan*, 125 F.R.D. 687, 688-89 (N.D. Ind. 1989), *aff'd*, 914 F.2d 909 (7th Cir. 1990)). The Court's scrutiny of material statements of facts applies equally to the party seeking summary judgment and the party opposing it.

Plaintiff's LR 56.1 response ("Pl.'s 56.1 Resp.") admits some facts as set forth by Defendant, and therefore those facts are deemed admitted for purposes of the summary judgment motion. For a number of additional allegations, Plaintiff objections to the fact, but does so without citing to any evidence to refute such facts. Such "objections," as Plaintiff styles them, with no evidentiary support are not sufficient to defeat summary judgment; rather, a nonmovant must support each denial with specific citations to the record or to supporting materials or affidavits that support their denial. See, *e.g., Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527-29 (7th Cir. 2000) (affirming summary judgment when district judge struck plaintiff's entire LR 12 (now LR 56.1) statement); *McGuire v. UPS*, 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraphs with citations to supporting evidence in the record constitutes an admission.") (internal citations omitted); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial."). As the Seventh Circuit has stressed, it is not the role of the Court to parse the parties' exhibits to construct the facts. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). "Nor are they archaeologists searching for treasure." *Jeralds ex rel. Jeralds v. Astrue*, 2010 WL 4942161, at *7 (N.D. Ill. Dec. 8, 2010) (citing *DiLeonardi,* 181 F.3d 865, 867 (7th Cir. 1999)). It simply is not the court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job * * * to make it easy

for the court to rule in his client's favor * * *." *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613 (7th Cir. 2006).

In sum, any statements or responses by either party that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on Defendant's motion for summary judgment. Any paragraph or fact that is not supported by record evidence will be disregarded. Indeed, the Court has not relied on any evidence as to which the admissibility is disputed in its disposition of Defendant's motion for summary judgment.

### B.     Facts

Plaintiff Joseph Madonia worked for BP from 2001 to 2009. In 2001, he began working at BP in a temporary position. On November 1, 2002, BP hired Plaintiff for the permanent position of tax and compliance analyst, a position that he held until 2004. Between 2004 and 2007, Plaintiff served as a financial settlements purchasing analyst. Plaintiff's supervisors were Tom Kijowski (Caucasian), Renee McCubbin (Caucasian), and Maria Jones-Sumner (Hispanic).

On December 9, 2005, while working as a financial settlements purchasing analyst, Plaintiff received a written warning from his team leader, Maria Jones-Sumner. The warning indicates that BP employees in other departments had complained about Plaintiff's rude behavior and notes that Plaintiff had been counseled on three prior occasions by his supervisors (Kijowski, McCubbin, and/or Jones-Sumner) about his interpersonal skills. Specifically, the December 2005 warning stated, "On three previous occasions either I or Renee McCubbin or Tom Kijowski has spoken to you about inappropriate interactions you've had with business colleagues. As we have previously discussed, I have received complaints from other departments that your behavior

has been rude toward them." Def.'s Ex. G. The warning also referenced an incident in November 2005, during which Plaintiff acted in a discourteous manner to his co-worker after the team leader had delegated a task to the co-worker. The warning noted that Plaintiff had apologized to the co-worker. The warning also referenced an incident on December 7, 2005, in which Plaintiff had sent an e-mail questioning his team leader's assignment of tasks and her means of assigning work. The warning advised Plaintiff that this was "a second incident of unacceptable behavior because you questioned my decision to delegate a task to another team member." The warning further advised Plaintiff about the need to "stay positive," "consider the impact of his words" and "keep the lines of communication open." Plaintiff was informed that further behavior of this nature would result in placement on a Performance Improvement Plan and could result in termination.

In Plaintiff's 2005 year-end review, McCubbin noted that Plaintiff needed to continue working to improve his communication with team members:

> I would like for Joe to continue focusing his attention on his relationships within the team and improvement of interpersonal skills. Joe can exhibit a likeable personality and get along very well with others, but when under stress he tends to let it get the best of him. He has committed himself to working on those issues and I would like to see him improve greatly in this area, as he has a lot to offer any team that he could be a member of.

Def.'s Ex. H. at 8. On the 2005 review, Plaintiff attributed his performance problems to a change in team leaders:

> This past year has been very difficult for my personal development and accomplishing my individual needs. With the addition of two new Team Leads this past year * * * the adjustment and transition has been tough to deal with. I haven't had the opportunity to develop or reach my personal needs because of these changes within our group. It's been hard to develop when the new TL needs time to transition and learn what it is I'm doing within the group.

*Id.* at 7. Plaintiff did not receive a merit (or salary) increase in 2006 due to Plaintiff's 2005 communications issues. Plaintiff acknowledged that his "interaction with one or two individuals may not have been so great," but he believed that he was nevertheless entitled to a merit increase based on his overall performance.

On December 5, 2006, Plaintiff applied for a position on the Demurrage team. The day-to-day responsibilities of the Demurrage team included the handling of claims and negotiations over billings for expenses accrued through routine delays in the transportation of petroleum products, especially delays in shipping. These negotiations occur between BP and its customers and other internal and external clients, and both parties agree that strong communication and customer service skills are essential to the job. Darwin Norals, an African-American male, who served as team leader for both Demurrage and Chemical Operations, interviewed and hired Plaintiff. Plaintiff began working as a Demurrage specialist on Norals' team in March 2007. Throughout Plaintiff's employment as a Demurrage specialist, the Demurrage team was part of BP Oil America's Operations Group, lead by the Operations Manager, Timothy Harms (Caucasian). At all relevant times, Harms was Norals' immediate supervisor and also was the immediate supervisor of all other team leaders within the Oil America's Operations Group. With the exception of Norals, all of the team leaders in the Operations Group during calendar year 2008 were Caucasian. In total, as of year end 2008, Norals' team consisted of nine employees, including six (6) Demurrage specialists (Gregory Canino, William Lang, Anthony Orona, Lowell Rupp, John Kingry and Plaintiff) and three Schedulers (Dawn Bryant, Sandra Fencl, and Nicholas Horbenko). Eight of the nine team members were Caucasian.

During Plaintiff's first year as Demurrage specialist, Norals volunteered to be a mentor to Plaintiff. With Norals as his direct supervisor, Plaintiff received a performance rating of

"performing" for 2007. Plaintiff wrote on his 2007 review, "Would also like to note that Darwin has been extremely helpful in my transition into Demurrage. The door has always been open for discussion/questions/ideas and I look forward to the coaching/mentoring in 2008." As of February 7, 2008, the date on which he signed the 2007 year-end performance review, Plaintiff believed he had had been treated fairly by Norals.

However, in 2008, Plaintiff and Norals began to have documented problems. On March 17, 2008, Norals instructed Plaintiff to keep him advised when Plaintiff planned to be out of the office. Norals sent a follow-up e-mail the same day, which encouraged Plaintiff to maintain a consistent attendance record in order to help him achieve his future goals and offering assistance in the short-term and long-term:

> Joe – as discussed, continue to keep me informed in advance when you plan to be out of the office. Remember to use this time while in the Demurrage team to work on broadening your IST ops knowledge, developing advanced Demurrage technical skills, and maintaining a consistent attendance and performance level that allows you to achieve your future goals. I'm here to assist you achieve these goals, and let me know if I can assist now and in the future.

On August 19, 2008, Plaintiff was reminded to inform Norals in advance when he planned to be out of the office after he failed to do so.

On May 29, 2008, a representative of one of BP's clients sent an e-mail to Norals and Plaintiff, asserting that Plaintiff had failed to process and pay outstanding invoices for the company despite 10 requests since December 2007. Plaintiff maintained that BP had not received copies of the invoices, but the client maintained that Plaintiff had e-mailed asking for copies of the invoices on April 8, 2008, that she had provided the requested invoices, and that Plaintiff had subsequently advised the client on two occasions that the claims were being processed. The client asked for Norals' help in rectifying the issue and apologized for having to escalate the issue to Norals' level. In response, Plaintiff sent an e-mail to Norals stating, "This is

ridiculous what [client] is complaining about and frankly, it's pissing me off * * * they have such an ass backward process in place and they need to fix it or we WILL continue to have issues like this."

During 2008, Plaintiff also was counseled about the need to respond in a timely fashion to requests from the Chemical bench, based on reports that Plaintiff failed to provide ad hoc reports requested by a chemical trader. Plaintiff does not deny that the reports were requested or that he failed to provide the reports. Instead, Plaintiff maintains that it was Norals who was responsible for the report.

On August 19, 2008, Norals met with Plaintiff to discuss Plaintiff's 2008 mid-year review. Norals rated Plaintiff's performance as "meeting expectations" but noted that Plaintiff needed to improve in the following areas: (1) "Maintain/develop good working relationship with third parties"; (2) "Look to understand third party processes and what's important to them as well as clearly communicate BP processes" * * * [e]xample discussed was the reporting request from the Chemicals Asset trader"; (3) "Continue to maintain a professional demeanor/attitude when clarity is needed on items of discussion * * * [e]xample discussed was the team policy on work from home days and maintaining the out of office file"; (4) "Hot Desk" spend time on the trading bench during the working day"; (5) "Increase/identify further saving opportunities"; and (6) "Better understanding of Demurrage contracts and general items and conditions." On August 21, 2008, Norals also sent Operations Manager Harms a summary of Plaintiff's mid-year review, noting that "Joe seems to require constant supervision and I question his maturity at times." He further noted that if he did not "see an improvement over the coming months," Plaintiff would be graded as "under performing" at year end. Plaintiff understood that he needed to improve his performance in the areas identified on the mid-year review.

In September 2008, Bernice Casado reached out to a client to determine whether BP had paid the client for an invoice in the amount of $1,589.14. The client responded stating that it had not paid for the invoice. Casado asked Plaintiff to resubmit the claim and stated that she would process it for payment. Plaintiff refused to re-submit the claim, insisting that the client had already been paid. Casado assured Plaintiff again that the invoice had not been paid, and Plaintiff responded as follows:

> Per my discussion with both Darwin and Bob, I will not be re-submitting this claim until we identify the issue that took place regarding the [clients'] (Supply) payment. I am still waiting for an explanation as to what happened to this claim when I issued it to you, and why the Supply group happened to get involved. Or did not get involved. None-the-less, this is an issue that needs to be addressed and rectified before moving forward.

Casado responded to Plaintiff's e-mail, explaining the efforts she had taken to resolve the billing issue.

On or about July 1, 2008, Plaintiff and other operations employees were trained on the Passport to Work Block Leave ("Block Leave") requirement, which was part of the BP Compliance Program. Pursuant to the Compliance Program, all operations associates were required to take Block Leave—a period of five (5) consecutive business days with no contact with his/her normal day-to-day work—during the 2008 calendar year. As part of the training program, associates were notified that they either had to take or book their Block Leave by September 30, 2008. Plaintiff admits that he completed training on the Block Leave requirement in August 2008, but maintains that he "would not be fulfilling this requirement" because his "vacation was accounted for" at the time that he completed the Block Leave test. According to Defendant, and not refuted by Plaintiff, Plaintiff still had sufficient vacation time available as of August 2008 to satisfy the Block Leave requirement. For instance, Plaintiff took 80 hours (or two weeks) of vacation between August 1, 2008 and December 31, 2008. In December 2008,

Plaintiff told Norals for the first time that he had not completed the Block Leave requirement for 2008, nor did he have sufficient vacation time to complete it. Plaintiff was the only member of Norals' team who failed to complete the requirement. Norals told Plaintiff he would have to talk to Harms and warned him that this could have ramifications on the entire team. Norals determined that Plaintiff had failed to record four (4) vacation days on the out-of-office spreadsheet for 2008. Specifically, Plaintiff was off work on January 24, 2008, February 11, 2008, March 12, 2008, and June 16, 2008, but these days were not recorded on the out-of-office spreadsheet, which was used to track time off for the Demurrage team. Plaintiff admits that he was out of the office on the days in question, but denies that he failed to record the days in the calendar.

Following the mid-year review, there were two incidents in which Plaintiff required counseling on appropriate professional conduct in the work place. In the first incident, a contracts manager complained that Plaintiff and three other members of the Demurrage team were laughing and joking too loud, distracting the other business units. Norals counseled each team member on "overall group communication." The second incident occurred in December 2008, when Plaintiff snapped his fingers to get the Norals' attention. Norals told Plaintiff that the behavior was unprofessional and instructed Plaintiff not to snap at him or at anyone else to get their attention.

Beginning with the 2008 performance year, the performance review process was revamped, such that what was previously a "performing" rating became a "meeting expectations" rating under the new system and an "underperforming" rating became a "below expectations" rating under the new system. Effective with the 2008 performance year, all BP employees, including those who fell under the umbrella of Operations, received annual

performance reviews and were rated exceptional ("E"), exceeds expectations ("EE"), meets expectations ("ME"), or below expectations ("BE"). The rankings were distributed across a forced bell curve so that a set percentage of all employees under the umbrella of Operations had to fall within each category. BP's 2008 Performance Management Matrix specifically provided that an employee falls into the below expectations category when "[b]ehaviors may cause concern, affecting delivery of objectives and not meeting expectations for the role and level."

The Staff Development and Deployment Network ("SDDN"), comprised of managers, team leaders and human resources personnel for a particular area met at year end to discuss preliminary rankings and calibrate associates across the performance rankings. In December 2008, the SDDN for the Operations team consisted of Operations manager Harms, the five team leaders reporting to Harms (Ray Guzik, Randy Hill, Greg Wilson, Mark Munch, and Norals) and Human Resources employee Jennifer Pierce. All the members of the SDDN in 2008 for the Operations team were Caucasian, except for Norals, and all of the members of the SDDN participated in a meeting to evaluate and rank BP employees on the team. Prior to the meeting, the team leaders within operations were asked to submit preliminary ratings, which would then be further discussed and calibrated during the meeting. Norals ranked Plaintiff last of his ten (10) reports, but assigned him a meets expectations rating going into the meeting. During the meeting, Norals discussed the performance issues that Plaintiff had throughout 2008. The SDDN discussed each and every employee in the department and reached a group consensus for each employee's ranking, which was approved by Harms. During the ranking session, it was determined that Plaintiff would receive a rating of below expectations for 2008. Two other employees received below expectations ratings—one was Caucasian and the other was Asian. Of the 42 operations employees reviewed by the SDNN, 34 associates (81%) were Caucasian

and eight associates (19%) were in a minority class; Caucasian associates accounted for 66% of

the below expectations ratings. After the meeting, Harms, Pierce, and Norals discussed

Plaintiff's performance concerns. Harms and Pierce instructed Norals that Plaintiff should be

giving a written warning and placed on a Performance Improvement Plan. Thereafter, Pierce

would assist Norals in preparing both the performance evaluation and the written Performance

Improvement Plan.

In finalizing the 2008 annual performance evaluations for the members of his team,

Norals sought feedback from managers in other departments within BP. Ann Chalmers, manager

of the Settlement Department, sent an e-mail to Norals, which detailed Plaintiff's "performance

in general":

> I'm sure that Joe has done a fine job on his side of the demurrage transactions
> related to the research and vetting of when a payment should be made or an
> invoice should be sent. However, once the transaction gets to my team, he does
> not have any patience to allow the transaction to be processed in a reasonable
> manner. He has sent more than one accusatory note about more than one member
> of my team not doing their jobs in a timely or accurate manner * * * * He is
> certainly doing the right thing in following up to make sure that transactions are
> being processes and that no one is dropping the ball. However, his tone is
> frequently adversarial and accusatory, rather than one of one team member
> working with another team member to accomplish a common goal.

On Thursday, February 12, 2009, Norals met with Plaintiff to inform him that he did not

meet BP's performance expectations for performance year 2008 and as a result had been

assigned a below expectations rating. Plaintiff was presented with a copy of the 2008

performance review, which stated:

> During 2008, although Joe met the basic requirements of the performance
> contract, he has had several recurring themes with behavior and communications
> issues that are not at a minimum expectation level. Joe has been inconsistent in
> maintaining the out of office file and does not take ownership when issues around
> maintaining a consistent attendance record are discussed. Joe has had to be
> reminded several times during the year to remember to accurately update the out
> of office spreadsheet; however, there are 4 days there were not recorded by Joe in

the out of office spreadsheet, resulting in inaccuracies on his days out of the office. Additionally, Joe did not complete the block leave requirement during 2008, which is a compliance breach. Further, I have received feedback concerning Joe being unprofessional with internal parties and speaking in tones that prevent effective communication.

During this meeting, Norals told Plaintiff that he would be placed on a 30-day Performance Improvement Plan. The Plan was lengthened to 45 days when Plaintiff was out of the office for three weeks in April 2009 due to a medical leave of absence. Plaintiff recorded this performance meeting without Norals' knowledge or consent. During his deposition, Plaintiff admitted that he recorded multiple conversations without BP's knowledge or consent. Plaintiff believed that Noral's criticism was inaccurate and unwarranted.

On February 13, 2009, Plaintiff sent an e-mail stating that he was taking vacation time starting at noon because he was "distraught by yesterday's news." Then, on Monday, February 16, 2009, Plaintiff sent documentation to Pierce in an attempt to refute the performance deficiencies noted in his review. The documentation included e-mail correspondence between Plaintiff and three individuals—a BP customer named Terri Beck, a member of the Demurrage team named William Lang, and a co-worker named Lynn Stadler. Plaintiff included a note prepared by him to Human Resources, in which he asserted, for the first time, that Norals "harasses, retaliates and intimidates employees." On a timeline which Plaintiff created and included with his February 16, 2009 submission, Plaintiff indicated that the intimidation began with Norals' response to the "snapping fingers" incident, when Norals purportedly told Plaintiff "Don't snap your fingers. That's not a form of communication." Plaintiff also identified as harassing conduct the follow-up e-mail from Norals expressing that "snapping is not an appropriate form of communication."

Pierce met with Plaintiff on February 16, 2009, to discuss the information that he had submitted. They predominantly discussed two issues: (1) the 2008 performance review and Performance Improvement Plan that would be issued as per the discussion on February 12, 2009; and (2) Plaintiff's new allegations of harassment and intimidation by Norals. Pierce told Plaintiff that Human Resources would conduct an investigation into the allegations asserted with respect to Norals. During this meeting, Plaintiff maintained that the feedback that Norals had received regarding Plaintiff's communication issues with other associates was unfounded. After meeting with Plaintiff, Pierce conducted an internal investigation to address Plaintiff's concerns about the feedback that his peers found him intimidating. Pierce spoke with various BP employees as a part of her investigation, including Ann Chalmer and Irma Ortiz. Defendant barred Plaintiff from the workplace while Pierce was completing her interviews with Plaintiff's fellow employees. Plaintiff was allowed to return to work on February 25, after Pierce had conducted her interviews, but he was advised to "close the door on determining the communication issues—in terms of approaching anyone about it—and focus on moving forward."

The Performance Improvement Plan was issued on February 19, 2009, and Plaintiff was notified that his failure to improve his performance would result in further discipline, up to and including termination. Plaintiff refused to sign the Performance Improvement Plan. On February 24, 2009, Norals sent an e-mail to all associates on his team attaching their 2009 performance contract—a document that outlines an employee's annual performance goals and expectations—and asking them to let him know if they had any proposed changes by February 26, 2009. Norals reminded Plaintiff that the deadline for submitting any comments was February 26, 2009, and extended the deadline for Plaintiff to submit his comments until noon on February

27, 2009. As of March 8, 2009, Plaintiff had not responded to Norals. When Norals e-mailed Plaintiff on March 8, 2009, that his failure to respond was "not acceptable," Plaintiff forwarded the e-mail to Pierce indicating that Norals words carried an "intimidating and loud tone." In the same e-mail, Plaintiff requested to meet with someone other than Norals, indicating that he did not feel comfortable meeting with Norals for the required weekly "catch up" sessions due to the tone of Norals' e-mail. When Pierce suggested that she attend the meetings between Plaintiff and Norals, Plaintiff declined the offer.

On April 23, 2009, when Plaintiff returned to work from his medical leave, he received a document labeled "Addendum 4/23/09." The document confirmed that Plaintiff's probation period had by extended by three weeks to May 13. The document set forth the areas that needed improvement. On May 13, Norals sent Pierce an e-mail expressing his conclusion that Plaintiff had not fulfilled the Performance Improvement Plan.

On May 14, 2009, Michael Schopler, a supply manager, approached Norals about Plaintiff's failure to provide information to resolve a customer issue. The customer was attempting to resolve a $300,000.00 demurrage issue and reported that BP had not responded to its inquiries. Schloper reported that he requested information from Plaintiff on January 26, 2009, and March 30, 2009, and that he received no response from Plaintiff until April 20, 2009. Plaintiff promised to provide the information within a day or two, but as of May 14, 2009, had not responded to Schopler.

On May 19, 2009, Harms made the decision to terminate Plaintiff's employment for failing to successfully complete the Performance Improvement Plan, and the termination became effective May 21, 2009.

Plaintiff filed the instant lawsuit on December 15, 2009, alleging discrimination and retaliation in violation of Title VII. In Plaintiff's complaint, he alleges that he received an unwarranted and unfavorable review, whereas similarly situated non-Caucasian employees received favorable work performance evaluations. During his deposition, Plaintiff testified that he was referring to Tony Orona as the similarly situated non-Caucasian employee that received a favorable review. Orona was the only non-Caucasian employee in Norals' group as of 2008. In 2008, all of Norals' team members except Plaintiff received a rating of meeting expectations or better. Mr. Orona was the only member of the Demurrage team to receive an exceeds expectations rating. William Lang, also a Demurrage team member (but not a supervisor) testified that he believed that Plaintiff was doing a better job than Orona. And Gregory Canino (another member of the Demurrage team) testified that he believed that Orona failed to put certain claims in the system. Finally, Lowell Rupp (also a member of the Demurrage team) testified that he believed Norals treated James Wine (Asian) more favorably than Caucasian team members because they would go to lunch together and "talked a lot."

After receiving an unfavorable review and being placed on a Performance Improvement Plan, on February 24, 2009, Plaintiff made a formal internal complaint of racial discrimination. Employment Practices Solutions, Inc. ("EPS"), a third party consultant, was hired to investigate Plaintiff's claim of intimidation and racial discrimination by Norals. While the investigation was ongoing, on April 1, 2009, Plaintiff also filed his first Charge of Discrimination with the EEOC and the Illinois Department of Human Rights alleging race discrimination. Specifically, Plaintiff alleged that during his employment, he was "subjected to intimation, unwarranted discipline, and unfavorable annual performance evaluations, whereas similarly situated, non-White employees have been treated more favorably." Plaintiff did not specify a date when the alleged

discrimination began, nor did he check the box alleging a "Continuing Action," but noted that the latest date of discrimination was March 17, 2009. After completing its investigation, which included interviewing Plaintiff, Norals, and the persons identified by Plaintiff as persons with information concerning his claims, the EPS investigator found Plaintiff's claims to be unsubstantiated.

On June 1, 2009, Plaintiff filed a second Charge of Discrimination with the EEOC and IDHR, alleging retaliation. Plaintiff did not specify the date that the retaliation purportedly began and specified that May 19, 2009 was the latest day of retaliation. Specifically, the charge alleges that "on or about April 1, 2009, I filed EEOC Charge # 440-2009-03126. On or about May 19, 2009, I was discharged. I believe I have been retaliated against for engaging in protected activity."

## II.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.

See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.,* 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id.* Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace,* 103 F.3d at 1396.

## III. Analysis

### A. Race Discrimination

Plaintiff claims that Defendant discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act when he was fired from his job as a Demurrage specialist at BP. Title VII prohibits discrimination in employment: "It shall be an unlawful employment practice for an employer * * * to discharge any individual because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prove a

17

case of discrimination under Title VII, a plaintiff may show discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) (explaining the misleading nature of this nomenclature and reiterating that the direct method may be proven with either direct or circumstantial evidence and that the indirect method proceeds under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)); see also *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Under the direct method of proof, the plaintiff may introduce either direct or circumstantial evidence to create a triable issue as to whether the adverse employment action was motivated by a discriminatory intent. *Id.*; see also *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 794 (7th Cir. 2005); *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997). In other words, the plaintiff must show either "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (citing *Gorence v. Eagle Foods Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)). Plaintiff has not presented any direct evidence of discrimination, and therefore must proceed under the indirect method.

Under the indirect method of proof initially set forth in *McDonnell Douglas Corp. v. Green*, a plaintiff first must establish a *prima facie* case of discrimination. 411 U.S. 792, 802-04 (1973). In order to establish a *prima facie* case of reverse race discrimination, a plaintiff must establish that: (1) background circumstances exist which support an inference that defendant is one of those "unusual employers who discriminates against the majority";[1] (2) he was qualified

---

[1] Title VII claims are not limited to "members of historically discriminated-against groups." *Mills*, 171 F.3d at 454. In fact, the legislative history of Title VII notes that it applies to "all Americans," including "white men and white women." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976). But a literal reading of the "member of a protected class" element would eliminate all reverse discrimination claims from white plaintiffs, and such a result would be contrary to Congress's clear intent about the scope of Title VII. As such, in reverse discrimination cases, the Seventh Circuit has eliminated the

for the job or was otherwise meeting the defendant's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999); see also *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 538 (7th Cir. 2007). If the plaintiff successfully establishes a *prima facie* case, a rebuttable inference of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997); see also *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is pretext. *Fane*, 480 F.3d at 538.

Even if Plaintiff could establish that he was meeting Defendant's legitimate expectations—which is unlikely given the well-documented warnings Plaintiff received throughout his tenure at BP, particularly during 2008 and 2009, as well as the complaints received from co-workers and clients—Plaintiff's race discrimination claim also falters on the first and fourth prongs. First, Plaintiff has not identified background circumstances that support an inference that BP is one of those "unusual employers who discriminates against the majority." Plaintiff has not produced any evidence that BP had any reason or inclination to discriminate against Caucasian individuals or that the facts of the case are "strange." The Demurrage team was part of BP Oil America's Operation Group, which was lead by Tim Harms, a Caucasian male. The majority of the employees in the Operations Group were Caucasian. Norals was the

---

membership in a protected class element of the traditional *McDonnell Douglas* test. In its place, Plaintiff must show " 'background circumstances' that demonstrate that a particular employer has 'reason or inclination to discriminate invidiously against whites' or evidence that 'there is something fishy' about the facts at hand." *Mills,* 171 F.3d at 455–57 (7th Cir.1999) (modifying *McDonnell Douglas* test to reverse discrimination claims); *Phelan v. City of Chicago,* 347 F.3d 679, 684 (7th Cir.2003).

only non-Caucasian team leader and he supervised a total of nine employees as of year-end 2008,

eight of whom were Caucasian. Plaintiff was the only member of the Norals' team to receive a

below expectations rating for 2008, meaning that seven of the eight Caucasians met expectations

or better. Furthermore, Plaintiff too had received a "performing" ranking for his 2007

performance review. And an independent investigation conducted by EPS determined that race

was not taken into consideration in the decision-making process concerning employee reviews

and concluded that Plaintiff's claims were unsubstantiated.

More importantly, the decision to rank Plaintiff's performance as below expectations for

2008 was not Norals' decision alone, although the evidence shows that Norals certainly agreed

with the ranking. Plaintiff, like all BP employees, was ranked in a process involving individuals

beyond the team leaders alone. In 2008, the team leaders were required to provide preliminary

rankings for their team members to Human Resources, which the SDDN further discussed and

calibrated during a ranking session. The SDDN was comprised of managers, team leaders, and

human resources personnel for a particular area. All members of the SDDN for the Operations

department were Caucasian, except for Norals. At the end of the 2008 performance year, the

SDDN discussed each employee in the department and voted on a ranking for each employee.

The SDDN came to a group consensus for each employee's final rating, which was approved by

Harms. During the ranking session, it was determined that Plaintiff would receive a rating of

below expectations for 2008, even though Norals initially ranked him as "meets expectations."

Furthermore, where, as here, the employment decision that a plaintiff complains of was

made by the same person who made the decision to hire the plaintiff, there is a strong

presumption of nondiscrimination. *EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d

145, 152 (7th Cir. 1996) (holding that where the plaintiff was hired and fired by the same

decision-maker, the same hirer/firer inference has strong presumptive value of nondiscrimination). The facts establish not only that Norals hired Plaintiff knowing he was Caucasian, but Norals also served as his mentor. Plaintiff also credited Norals for his successful performance for 2007, placing further into doubt Norals' alleged racial animus toward Plaintiff. If Norals wished to discriminate against Plaintiff because of his race, he could have refused to hire him in the first place or refused to mentor him. *Id.* Norals did neither and instead gave Plaintiff several opportunities to improve his performance despite less than glowing reviews internally and from clients.

With respect to the fourth prong, Plaintiff has not identified another employee who engaged in similar conduct and was not terminated. "A similarly situated employee is one who is directly comparable to [the plaintiff] in all material respects." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003) (internal quotation omitted). The only person whom Plaintiff believes was similarly situated to him is Tony Orona, a Hispanic male, who also was a Demurrage specialist at the time Plaintiff was fired. Orona was the only non-Caucasian employee on the Demurrage team. But Plaintiff has not presented any evidence that Orona was ever formally counseled or reprimanded by a supervisor about his behavior or attitude, let alone with the same frequency that Plaintiff was counseled and/or reprimanded. For instance, Plaintiff admits that he was the only employee in Norals group to fail to satisfy the Block Leave requirement. According to Human Resources employee Pierce, this failure alone warranted a below expectations rating. Moreover, both parties agree that strong communication and customer service skills are essential to a job in Demurrage. Plaintiff's performance issues included well-documented incidents indicating shortcomings in his interpersonal and communication skills (including unprofessional e-mails sent by Plaintiff himself), whereas there

is no evidence in the record that Orona had these issues. Plaintiff has not identified anyone in Norals' group, much less a non-Caucasian employee, who exhibited similar performance deficiencies.

Plaintiff relies exclusively on the testimony of three co-workers—Canino, Rupp, and Lang—to support his claim that Defendant discriminated against him. However, none of the three co-workers ever made formal complaints of race discrimination against Norals prior to Plaintiff's claim. Canino, after receiving an underperforming rating for 2005 under the supervision of Norals' predecessor (a Causasian), and receiving an underperforming rating for the following year (2006) under Norals, disagreed that the ratings accurately reflected his performance. Canino testified that he believed that there had to be a reason "that this was happening. It could be age discrimination. It could be retaliation. It could be he's an incompetent manager. I don't know what the reason is." Canino reiterated during his deposition that he believed that he told Heller that Norals was either "retaliating, age discrimination, he's got psychological problems or he is just a bad manager." There is no evidence in the record that Canino ever made a formal complaint of discrimination. Rupp also received a below expectations rating for 2006 and made a complaint to BP that he believed that he was treated differently because of his age. Lang, who never received an underperforming or below expectations rating under Norals' supervision, never complained of discrimination of any kind..

Plaintiff's reliance on these witnesses to overcome summary judgment is misplaced. The fact that Canino and Rupp (both Caucasian and over the age of 50) mentioned age discrimination when they complained about receiving below expectations for their 2006 annual evaluations is inconsequential in determining the viability of Plaintiff's claim of race discrimination stemming from his 2008 annual evaluation. Evidence of discrimination against other employees is relevant

only if the plaintiff is able to show that the action taken against the other employee was based on discrimination. *Stopka v. Alliance of American Insurance*, 141 F.3d 681, 687 (7th Cir. 1998). Plaintiff has not presented such evidence. Instead, Plaintiff ignores the fact that several other employees in Norals' group (the majority of whom are Caucasian) received favorable reviews under Norals' supervision. Finally, the opinion of Plaintiff and two co-workers that Plaintiff was performing better than Orona cannot defeat summary judgment—"[t]hey were not charged with the responsibility of monitoring and evaluating [Plaintiff's] work performance; [Norals] was." See *Luks v. Baxter Healthcare Corp.,* 467 F.3d 1049, 1056 (7th Cir. 2006) (holding that neither plaintiff's opinion nor opinions of other employees that plaintiff was doing a good job is relevant.).

Although the Court finds that Plaintiff has fallen far short of establishing a prima facie case of reverse race discrimination, Defendant also has offered numerous legitimate non-discriminatory reasons for its decision to terminate Plaintiff, and he has not offered any evidence that any of those reasons are pretext for illegal discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Here, Defendant has established that it terminated Plaintiff because he had difficulties working professionally with other staff members, was often aggressive and rude to his coworkers, failed to satisfy the Block Leave requirement, received complaints from clients as well as employees in other departments, and generally engaged in a pattern of behavior that made his supervisor believe that he did not possess the communication skills necessary to succeed in his role as a Demurrer specialist. See *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 401 (7th Cir. 1992) (poor performance and failure to get along with others constituted a legitimate, nondiscriminary reason for an employee's discharge). Plaintiff was counseled, reprimanded, and warned by his supervisor, throughout the year and during mid-year

and year-end reviews, over the course of several years, about improving his communication skills. As Plaintiff acknowledged, interpersonal relationships and appropriate communications skills are taken into consideration by BP and valued in assessing an employee's performance. Plaintiff's well-documented problems in these areas, coupled with his admitted failure to participate in the Block Leave requirement, provided BP with legitimate, non-discriminatory reasons for firing him.

Since Defendant has put forth non-discriminatory explanations for its termination of Plaintiff, the burden now shifts to Plaintiff to prove that the bias-neutral reason proffered by Defendant was a pretext or an explanation designed to obscure the unlawful discriminatory employment action. *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 629 (7th Cir. 1996). In order to avoid summary judgment, a plaintiff must show that the reason given is unworthy of credence. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097 (2000). To accomplish this requirement, a plaintiff must provide evidence to prove that Defendant's reasons were either factually baseless, were not the actual motivation for the action, or were insufficient to motivate the action. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888-89 (7th Cir. 2001). To avoid summary judgment, Plaintiff must show by a preponderance of the evidence that this proffered reason is pretextual. A plaintiff shows that a reason is pretextual "directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). An employer's decision to promote is pretextual when "it is a lie – a phony reason meant to cover up a disallowed reason. Otherwise, an employer's decision to favor one candidate over another can be 'mistaken, ill-considered or

24

foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown.'" *Id.* (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002)). In order to establish pretext, Plaintiff must show that Defendant's articulated reason for its decision (1) had no basis in fact; (2) did not actually motivate the Defendant's decision; or (3) was insufficient to motivate the action. *Hughes v. Brown*, 20 F.3d 745, 747 (7th Cir. 1994). Plaintiff must "*specifically* refute facts which allegedly support the employer's proffered reasons"; conclusory statements about an employer's prejudice are insufficient to establish pretext. *Alexander v, CIT Tech. Fin. Servs., Inc.*, 217 F. Supp. 2d 867, 890 (N.D. Ill. 2002) (emphasis in original).

There is nothing in the record that would support a finding that Defendant's stated reason for terminating Plaintiff was a fabrication. The record is clear that Plaintiff failed to complete the Block Leave requirement and was counseled repeatedly over the years, and particularly in 2008 and early 2009, in regard to his interpersonal dealings with co-workers and clients. Plaintiff has not come forth with sufficient evidence that the reasons offered by Defendant—that Plaintiff had communication issues, lacked certain interpersonal skills, could be accusatory and aggressive with his co-workers, and failed to meet a basic requirement—were lies. Plaintiff has not provided any evidence (other than his subjective beliefs during his deposition and one co-workers opinion that "race" might have been a factor in a 2005 situation) that any decision was motivated by his race, or demonstrated that his race was a factor in the decision to fire him. There simply is no evidence from which a reasonable person could find that Defendant fired Plaintiff because Plaintiff is Caucasian.

In addition to failing to demonstrate pretext, Plaintiff's discrimination claim falls short of those circumstances in which courts have found discrimination. The fact that there might have been tension or friction between Plaintiff and his co-workers and supervisor—because Plaintiff

believed he was doing a good job and his supervisor and co-workers at times did not—without more, is not indicative of the alleged discrimination, but perhaps of a difficult working environment and of differences of opinion within that environment, neither of which is actionable. The Court does not sit as a "super personnel department" to review an employer's business decisions (see *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000)), and thus cannot adjudicate whether co-workers communicate well, whether co-workers "liked" Plaintiff, or whether Defendant made accurate, wise, or well-considered employment decisions. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered"). For the foregoing reasons, in addition to failing to make out a prima facie case of reverse race discrimination, Plaintiff has not met his burden of proving that Defendant's articulated nondiscriminatory reasons for firing him were pretext.

In sum, missing from Plaintiff's reverse race discrimination claim is any evidence or a reasonable inference that Plaintiff received a below expectations rating for the 2008 performance year and was placed on a Performance Improvement Plan because of Plaintiff's race. In the end, Plaintiff may strenuously disagree with BP's determination that his performance was unsatisfactory for 2008, but Plaintiff has not presented a shred of evidence of discriminatory animus. See *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) (finding that plaintiff's "own perceptions" that his performance was adequate could not defeat summary judgment). BP believed that Plaintiff was unable to successfully complete the objectives of the Performance Improvement Plan, ultimately resulting in his discharge. At most, Plaintiff has demonstrated a fundamental and profound disagreement between BP's view of Plaintiff's performance and his own opinion, but has not demonstrated that BP discriminated against him

on the basis of his race. Therefore, the Court grants summary judgment in favor of Defendant on Plaintiff's race discrimination claim.

### B.     Retaliation

Plaintiff also has sued BP for retaliation, claiming that BP fired him in retaliation for filing two charges of discrimination and complaining internally of race discrimination. Under the anti-retaliation provision of Title VII, it is unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." *Brown*, 499 F.3d at 684 (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 662 (7th Cir. 2006) (quotations and citations omitted). "Under the direct method, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two." *Id.* at 663 (quotations and citations omitted). Alternatively, under the indirect approach, in order to establish a *prima facie* case for retaliation, the employee must show that (1) after filing a charge, the employee was subject to adverse employment action; (2) at the time, the employee was performing his job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action. See *Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 560 (7th Cir. 2004). "'If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action.'" *Tomanovich,* 457 F.3d at 663 (quoting *Adusumilli v. City of Chicago,* 164 F.3d 353, 362 (7th Cir. 1998)). Then, if the employer presents evidence of a non-discriminatory reason for its employment action, "'the

burden shifts back to the plaintiff to demonstrate that the employer's reason is pre-textual.'" *Id.* (quoting *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)).

Under the direct method, in order to demonstrate a causal link between a termination and the filing of a charge of discrimination, a plaintiff must demonstrate that the employer would not have taken any adverse action "but for" the protected expression. *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 479 (7th Cir. 1995). A plaintiff's uncorroborated deposition testimony is almost always insufficient to demonstrate a causal link. *Sylvester v. SOS Children's Vills Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). In the instant case, Plaintiff first complained of discrimination in February 2009 and filed his first Charge of Discrimination with the EEOC on March 30, 2009, both complaints occurring after he received a "below expectations" review and after he had already been placed on the Performance Improvement Plan. Defendant has presented ample evidence that Plaintiff's employment was terminated for failing to meet the goals outlined in the Performance Improvement Plan after Plaintiff was given several opportunities to do so. Furthermore, Plaintiff's employment was not terminated until almost two (2) months after he filed the Charge. The Seventh Circuit has held that a two month gap between the protected activity and the termination is insufficient, where the plaintiff was on a performance improvement plan prior to engaging in any protected activity.[2] See *Tomanovich v. City of Indianapolis*, 457 F.3d at 665; also see *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (holding a temporal connection of three months alone could not reasonably support a casual connection for a retaliation claim). Furthermore, the Seventh Circuit has held that "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to

---

[2] In regard to timing, what is most notable is that Plaintiff never once complained about discrimination until after he received a negative evaluation and was placed on the Performance Improvement Plan.

create a triable issue." *Szymanski v. County of Cook*, 72 Fed. Appx. 451 (7th Cir. 2003). Plaintiff plainly has not demonstrated a causal link between a termination and the filing of a charge of discrimination.

Under the indirect method, the Seventh Circuit requires a plaintiff "to show that after filing the charge [or otherwise opposing the employer's allegedly discriminatory practice] only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner." See *Sylvester v. SOS Children's Vills Ill., Inc.*, 453 F.3d at 902; *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002). Then, if the employer presents evidence of a non-discriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pre-textual. *Id.*

As described in detail in analyzing Plaintiff's discrimination claim, Plaintiff failed to consistently improve his performance before and after he was placed on the Performance Improvement Plan. On February 12, 2009, Norals met with Plaintiff to inform him that he did not meet BP's performance expectations for performance year 2008 and as a result had been assigned a below expectations rating. Plaintiff was presented with a copy of the 2008 year-end review, which stated,

> During 2008, although Joe met the basic requirements of the performance contract, he has had several recurring themes with behavior and communications issues that are not at a minimum expectation level. Joe has been inconsistent in maintaining the out of office file and does not take ownership when issues around maintaining a consistent attendance record are discussed. Joe has had to be reminded several times during the year to remember to accurately update the out of office spreadsheet; however, there are 4 days there were not recorded by Joe in the out of office spreadsheet, resulting in inaccuracies on his days out of the office. Additionally, Joe did not complete the block leave requirement during 2008, which is a compliance breach. Further, I have received feedback concerning Joe being unprofessional with internal parties and speaking in tones that prevent effective communication.

During this meeting, Norals told Plaintiff that he would be placed on a Performance Improvement Plan. Norals originally told Plaintiff that the performance improvement period would be 30 days, but the period was extended to 45 days. The Performance Improvement Plan further stated, "In the event that your performance over the next few weeks does not reach the level outlined above, and/or you continue to show a lack of initiative in taking this situation seriously, you will be subject to additional disciplinary action, which may include termination."

In Defendant's view, Plaintiff's performance did not improve. HR employee Pierce (a Caucasian woman) believed that Plaintiff appeared to be intentionally trying to create conflict with his team lead, rather than demonstrating that he was committed to improvement. For example, on February 24, 2009, Norals sent an e-mail to all associates on his team attaching their 2009 Performance Contract and asking them to respond letting him know if they had any proposed changes by February 26, 2009. Norals reminded Plaintiff that the deadline for submitting any comments was February 26, 2009, and extended the deadline for Plaintiff to submit his comments until noon on February 27, 2009. However, as of March 8, 2009, Plaintiff still had not responded to Norals. When Norals again e-mailed Plaintiff on March 8, 2009 that his failure to respond was "not acceptable," Plaintiff forwarded the e-mail to Pierce indicating that Norals words carried an "intimidating and loud tone." In this same e-mail, Plaintiff requested to meet with someone other than Norals, indicating that he did not feel comfortable meeting with Norals for the required weekly "catch up" sessions due to tone of Norals' e-mail. When Pierce suggested that she attend the meetings with Plaintiff, he declined her offer.

Then, on May 14, 2009, Norals was approached by Michael Schopler about Plaintiff's failure to provide requested information to resolve a customer issue. Specifically, Schopler reported that the customer requested his assistance in resolving a $300,000.00 Demurrage issue

because the customer had not received any response from Plaintiff. Schopler informed Norals that he had been requesting the report since January 26, 2009, and received no response from Plaintiff. After requesting the report again on March 30, 2009, Plaintiff responded on April 20, 2009, promising to provide the requested report within a day or two. However, based on Schopler's e-mail to Norals on May 14, 2009, Plaintiff had failed to provide the requested information to Schopler.

Plaintiff was terminated on May 19, 2009 for failing to bring his performance to an acceptable level. The decision to terminate Plaintiff was made by Tim Harms and approved by Andy Milnes, Head of Supply and Trading Oil Americas, both of whom are Caucasian males, on the recommendation of Norals. The fact that Plaintiff lodged complaints after he received a negative evaluation and was placed on the Performance Improvement Plan does not mean that BP retaliated against him. Instead, based on the record, it is readily apparent that BP honestly believed Plaintiff was not performing up to expectations and therefore termination was appropriate. BP was entitled to this view, and the evidence presented by Plaintiff does not come close to painting a different picture.

### III.    Conclusion

For these reasons, the Court grants Defendant's motion for summary judgment [29]. Judgment will be entered in favor of Defendant BP and against Plaintiff Joseph Madonia on all claims.

Dated:  January 4, 2012                        _____
                                               Robert M. Dow, Jr.
                                               United States District Judge